The People of the State of New York ex rel. Michael Broderick, Respondent, *v.* Levi P. Morton, Charles T. Saxton and Hamilton Fish, Trustees of Public Buildings, and Frederick P. Easton, Superintendent of Public Buildings, Appellants.

1. Mandamus — Governor not Subject to. The courts of this state have no power to issue a mandamus to the governor to compel his performance of a duty imposed upon him by virtue of his office; and this inability extends to ministerial duties as well as to those involving executive judgment and discretion, and to action by the governor as an *ex officio* member of a board of public officers.

2. Lieutenant-Governor and Speaker. *It seems*, that a mandamus can run to the lieutenant-governor and speaker of the assembly during the recess of the legislature, provided they have not succeeded to executive power.

3. Public Employment — Veterans — Mandamus to Trustees of Public Buildings  A mandamus does not lie against the governor, as a trustee of public buildings, to compel him, together with the lieutenant-governor and speaker of the assembly, as the other trustees of public buildings, and the superintendent of public buildings, to reinstate the relator in an employment in a public building on the ground that, being a veteran, he had been removed in violation of chapter 716 of Laws of 1894.

4. Change of Incumbents in Office During Mandamus Proceeding. Where, after the issuance of an alternative writ of mandamus to the persons then holding the offices of governor, lieutenant-governor and speaker, to compel them as the trustees of public buildings, and the superintendent of public buildings, to reinstate a veteran in employment, on the ground that he had been removed in violation of chapter 716 of Laws of 1894, a peremptory writ is denied, and the Appellate Division reverses the denial, and the term of office of the persons proceeded against as trustees having expired, orders the peremptory writ to issue to the governor, lieutenant-governor and speaker then in office, without notice to and substitution of such new officials in the proceeding, the order is not sustainable.

5. Non-abatement of Special Proceeding. *Quære*, whether section 755 of the Code of Civil Procedure, relating to the non-abatement of special proceedings, applies to a mandamus proceeding where there has been no death of a party, but certain of the parties proceeded against have gone out of office.

6. Substitution of Successor in Office. *It seems*, that the practice prescribed by section 1930 of the Code of Civil Procedure, for the substi-

tution of the successor in office of a party to an action or special proceeding against county, town or municipal officers, applies to state officers.

*People ex rel. Broderick* v. *Morton,* 24 App. Div. 563, reversed.

(Argued April 18, 1898; decided June 7, 1898.)

APPEAL from a final order of the Appellate Division of the Supreme Court in the third judicial department, entered January 24, 1898, reversing an order of the Special Term refusing a writ of mandamus, and granting a peremptory writ against Frank S. Black, Timothy E. Woodruff, James M. E. O'Grady and Frederick P. Easton, commanding them as trustees and superintendent of public buildings to reinstate the relator, Michael Broderick, in his employment as laborer in the Capitol building, without prejudice to an action or proceeding to recover damages for his removal.

The facts, so far as material, are stated in the opinions.

*G. D. B. Hasbrouck* for appellants.   The Supreme Court has no jurisdiction to coerce the executive department of the government into obeying its writ of mandamus. (Public Buildings Law [Birdseye's R. S. (2d ed.) 2408]; *Rice* v. *Austin,* 19 Minn. 403; ch. 716, L. 1894; *Dennett, Petitioner,* 32 Me. 508; *Maurau* v. *Smith,* 8 R. I. 192; *State* v. *Stone,* 120 Mo. 428; *Sutherland* v. *Governor,* 29 Mich. 330; 1 Cooley's Blackstone, 242; *Com.* v. *Dennison,* 24 How. [U. S.] 97; 1 Shars. Black. Com. 242; *State ex rel.* v. *Warmouth,* 22 La. Ann. 1; art. 4, State Const.; *State* v. *Sauvinel,* 24 La. Ann. 119; 13 Am. Rep. 115; *People* v. *Yates,* 40 Ill. 127.)   Levi P. Morton, Charles T. Saxton and Hamilton Fish, trustees of public buildings, having retired from their offices of governor, lieutenant-governor and speaker, have now no power to comply with a writ of mandamus requiring the reinstatement of Broderick, and Frank S. Black, Timothy L. Woodruff and James M. E. O'Grady are not parties to the proceedings, and consequently are. not within the jurisdiction of the court, and the order and judgment herein directing a peremptory

writ to issue against them, commanding them to "reinstate the relator Michael Broderick in his employment as a laborer in the Capitol building, held by him on and prior to October 2, 1895," is without warrant or authority in the law. (Code Civ. Pro. §§ 755, 757; Public Buildings Law, art. 1, § 4; Birdseye's R. S. [2d ed.] 2408; ch. 716, L. 1894; *People ex rel.* v. *Reardon*, 49 Hun, 425; *People* v. *Suprs. of Greene Co.*, 12 Barb. 217; *People ex rel.* v. *Hayt*, 66 N. Y. 606; *People ex rel.* v. *Canal Appraisers*, 73 N. Y. 447; *Secretary* v. *McGarrahan*, 9 Wall. 298, 313; *United States* v. *Boutwell*, 17 Wall. 604–609; *Commissioners* v. *Sellers*, 99 U. S. 624, 626; *United States* v. *Shurz*, 102 U. S. 378–408; *Thompson* v. *United States*, 103 U. S. 480–484; *United States* v. *Chandler*, 122 U. S. 643; *United States* v. *Lamont*, 155 U. S. 303–306; *United States* v. *Long*, 164 U. S. 701; 165 U. S. 28.) The relator, by waiting from October 2, 1895, until February 24, 1896, became barred of his remedy. (*In re Vanderhoof*, 36 N. Y. Supp. 834; *People ex rel.* v. *Justices,* 78 Hun, 334.)

*Michael D. Nolan* for respondent. The relator was removed from his position for other causes than "incompetency and conduct inconsistent with the position held," and was deprived of his rights under chapter 716 of the Laws of 1894. (*People ex rel.* v. *Mayor, etc.*, 149 N. Y. 225; *People ex rel.* v. *Adams*, 51 Hun, 583.) Admitting all the defendants attempted to show, it only establishes that this particular elevator was closed temporarily, not that it was abolished. (*People ex rel.* v. *Morton*, 148 N. Y. 156; ch. 654, p. 1648, L. 1894; ch. 358, p. 719, L. 1894; ch. 807, p. 572, L. 1895; ch. 932, pp. 755, 756, L. 1895; ch. 948, p. 1044, L. 1896; ch. 73, L. 1896.) The case, however, shows bad faith on the part of defendants. The two reasons given for the discharge of relator were not the real reasons, and the referee's finding of good faith is entirely unsupported by evidence. (*Matter of McCloskey* v. *Willis*, 15 App. Div. 594; *Matter of Sullivan,* 55 Hun, 289; *People ex rel.* v. *Adams*, 53 Hun, 141.) The

Civil Service Laws do not apply, the salary being but seventy-five dollars per month. (Ch. 717, L. 1884.) The board of trustees of public buildings may be mandamused under chapter 716, Laws of 1894. (High on Ex. Rem. 4; § 2090, Code Civ. Pro.) The relator does not ask too much in asking for damages in this proceeding. (§ 2088, Code Civ. Pro.; *People ex rel.* v. *M. M. P. Union,* 118 N. Y. 101; *People ex rel.* v. *Wappingers Falls,* 151 N. Y. 386.) However, if in any respect relator has asked too much, the final writ may award what relief the facts warrant. (*People ex rel.* v. *Supervisors,* 142 N. Y. 271-278; § 2082, Code Civ. Pro.)

HAIGHT, J.   For a number of years the relator had been employed in the Capitol of the state as a laborer, engaged in the running of the senate elevator. On the 2d day of October, 1895, he claims he was discharged. After the expiration of about five months, he procured an alternative writ of mandamus to issue to the then trustees and superintendent of public buildings, requiring his reinstatement as laborer in the Capitol, upon the ground that he was an honorably discharged Union sailor of the war of the rebellion. To the alternative writ an answer was filed on behalf of the defendants, raising an issue, which, upon the stipulation of the parties, was referred to a referee to hear, try and determine. After taking the evidence submitted by the respective parties, the referee made his report, finding that the relator had been dropped from the pay rolls by reason of the shutting down of the senate elevators for repairs, and that he had not been removed. Thereupon the peremptory writ was refused by the Special Term. An appeal was then taken to the Appellate Division, where the order of the Special Term was reversed and a peremptory writ issued.

At the time the relator procured the alternative writ of mandamus Levi P. Morton was the governor of the state, Charles T. Saxton, the lieutenant-governor, and Hamilton Fish, the speaker of the assembly.

The Public Buildings Law of 1893, chapter 227, as amended,

140 People ex rel. Broderick *v.* Morton. [June,

Opinion of the Court, per Haight, J. [Vol. 156.

provides that " the governor, lieutenant-governor and speaker of the assembly shall be trustees of public buildings." As such they are authorized to appoint a superintendent who, " subject to the approval of the trustees, may appoint all persons necessary in the maintenance department of the public buildings and grounds under his charge and suspend and remove any of them and prepare rules and regulations for their government."

It will be observed that, under the provisions of the statute, the governor, lieutenant-governor and speaker become trustees by virtue of their offices, and that whatever duties devolve upon them as such, pertain to their respective offices.

Chapter 312 of the Laws of 1884, as amended by chapter 716 of the Laws of 1894, provides that, " In every public department and upon all public works of the state of New York, and of the cities, towns and villages thereof, and also in non-competitive examinations under the civil service rules, laws, or regulations of the same, wherever they apply, honorably discharged Union soldiers and sailors shall be preferred for appointment and employment; age, loss of limb or other physical impairment which does not, in fact, incapacitate, shall not be deemed to disqualify them, provided they possess the business capacity necessary to discharge the duties of the postion involved. And, in all cases, the person having the power of employment or appointment, unless the statute provides for a definite term, shall have the power of removal only for incompetency and conduct inconsistent with the position held by the employee or appointee; and, in case of such removal, or such refusal to allow the preference provided for in this act of and for any such honorably discharged Union soldier, or sailor, or marine, for partisan, political, personal or other cause, except incompetency, and conduct inconsistent with the position so held, such soldier, sailor or marine, so wrongfully removed, or refused such preference shall have a right of action in any court of competent jurisdiction for damages as for an act wrongfully done, in addition to the existing right of mandamus; the burden of proving such

incompetency and inconsistent conduct, as a question of fact, shall be upon the defendant." A failure on the part of the officials to comply with the terms of this act in letter and spirit, is made a misdemeanor.

It is now contended that the Appellate Division had no jurisdiction to award a mandamus in this case. Much has already been written upon the subject. The courts of most of the states in the Union have had it under consideration, and, while they uniformly agree that the courts have no right nor power to interfere with the governor upon questions involving his judgment and discretion, yet they differ widely as to the power to interfere with his ministerial action. We shall not attempt any extended digest of these cases. Among those tending to sustain the power of the court to compel the executive to perform a ministerial act are *Martin* v. *Ingham* (38 Kan. 641); *Harpending* v. *Haight* (39 Cal. 189); *Middleton* v. *Low* (30 Cal. 596); *Tennessee & C. R. R. Co.* v. *Moore* (36 Ala. 380); *Chumasero* v. *Potts* (2 Mont. 242); *Cotten* v. *Ellis* (7 Jones [N. C.], 545); *State* v. *Chase* (5 Ohio St. 528); *State* v. *Moffitt* (5 Ohio, 362); *Magruder* v. *Swann* (25 Md. 212); *Chamberlain* v. *Sibley* (4 Minn. 312).

Of the cases which support the contention that the courts are without jurisdiction to control executive action are the following: *Sutherland* v. *The Governor* (29 Mich. 320); *State* v. *Drew* (17 Fla. 67); *State* v. *Towns* (8 Ga. 360); *People ex rel.* v. *Cullom* (100 Ill. 472); *People ex rel.* v. *Bissell* (19 Ill. 229); *State* v. *Kirkwood* (14 Iowa, 162); *State* v. *Warmoth* (22 La. Ann. 1); *Dennett, Petitioner* (32 Maine, 508); *State* v. *Stone* (120 Mo. 428); *State* v. *The Governor* (25 N. J. L. 331); *Mauran* v. *Smith* (8 R. I. 192); *Bates* v. *Taylor* (87 Tenn. 319 ; 85 Texas, 622); *Marbury* v. *Madison* (1 Cranch, 137).

The ministerial duties which it has been held in different states may be compelled by mandamus are the commissioning of a clerk of a court, the issuance of a warrant for the attorney-general's salary, the auditing of an officer's claim for expenses, the commissioning of officers chosen by the legislature, the issuance of state bonds to a railroad company, the

authentication of a bill in the governor's possession as a stat-
ute, the issuance of a proclamation that a bank is authorized
to begin business, and such duties imposed by statute upon the
governor as might have been imposed upon another officer,
when ministerial.   On the other hand, in a large number of
other states, it has been held that a mandamus will never issue
against the governor, regardless of the duty imposed upon him
by the Constitution or statute.   In those cases it was con-
sidered to be against public policy and political necessity, and
to be immaterial that the duty might have been imposed upon
another person ; that inasmuch as it was imposed upon the
governor, its performance was an executive act, under the
responsibility of his executive station, and under the sanctity
of his official oath.   Perhaps the leading case in support of
the latter contention is that of *Sutherland* v. *The Governor*
(29 Mich. 320), in which the opinion was delivered by Judge
Cooley.   In that case the court was asked to compel the gover-
nor to perform the duty imposed upon him by statute, of certi-
fying as to the completion of certain work.   The judge says
with reference thereto : " It is not claimed on the part of the
relators that this court, or any other, has jurisdiction to require
and compel the performance by the governor of his political
duties, or the duties devolved upon him as a component
part of the legislature.   It is conceded that these, under the
Constitution and laws, are to be exercised according to his
own judgment and on his own sense of official responsibility,
and that from his decision to act, or decline to act, there can
be no appeal to the courts.   Nor is it pretended that where
any executive act whatsoever is manifestly submitted to the
governor's judgment or discretion, such judgment or discre-
tion can be coerced by judicial writ.   What is claimed is, that
where the act is purely ministerial and the right of the citizen
to have it performed is absolute, the governor, no more than
any other officer, is above the laws, and the obligation of the
courts, on a proper application, to require him to obey the
laws, is the same that exists in any other case where an offi-
cial ministerial duty is disregarded.   *   *   *   There is no

clear and palpable line of distinction between those duties of the governor which are political and those which are to be considered ministerial merely, and, if we should undertake to draw one and to declare that in all cases falling on one side of the line, the governor was subject to judicial process, and in all falling on the other, he was independent of it, we should open the door to an endless train of litigation. * * * However desirable a power in the judiciary to interfere in such cases might seem from the standpoint of interested parties, it is manifest that harmony of action between the executive and judicial departments would be directly threatened, and that the exercise of such power could only be justified on most imperative reasons." Again he says : " When duties are imposed upon the governor, whatever be their grade, importance or nature, we doubt the right of the courts to say that this or that duty might properly have been imposed upon a secretary of state, or a sheriff of a county, or other inferior officer, and that inasmuch as in case it had been so imposed, there would have been a judicial remedy for neglect to perform it, therefore, there must be the like remedy when the governor himself is guilty of a similar neglect.   The apportionment of power, authority and duty to the governor, is either made by the people in the Constitution, or by the legislature in making laws under it; and the courts, when the apportionment has been made, would be presumptuous if they should assume to declare that a particular duty assigned to the governor is not essentially executive, but is of such inferior grade and importance as properly to pertain to some inferior office, and, consequently, for the purposes of their jurisdiction, the courts may treat it precisely as if an inferior officer had been required to perform it.   To do this would be not only to question the wisdom of the Constitution or the law, but also to assert a right to make the governor the passive instrument of the judiciary in executing its mandates within the sphere of his own duties.   Were the courts to go so far, they would break away from those checks and balances of government which were meant to be checks of co-operation, and not of antagonism or mastery, and would

concentrate in their own hands something at least of the power which the people, either directly or by the action of their representatives, decided to entrust to the other departments of the government."

In this state we have not found, nor has our attention been called to, any controlling authority upon the question. Under our Constitution the right of sovereignty rests in the people of the state, who, from time to time, delegate their power to rule to a government chosen by themselves, consisting of three departments, known as the executive, legislative and judicial. In England the power of the king to govern was modified from time to time by various grants from him, and by Magna Charta, under which the lawmaking power finally devolved upon Parliament, and the judicial power upon the courts, created by law. This division of power was followed in the formation of our American governments. In our own state the common law was continued in force, except in so far as it has been altered by the Constitution or the legislature.

Under our Constitution the executive power of the state answers to that of the king, and devolves upon the governor during the term for which he is elected. The legislative power is vested in the senate and assembly, which take the place of Parliament, and the judicial power in the courts established in accordance with the provisions of the Constitution. The three great branches of government are separate and distinct, but are coequal and co-ordinate; their powers have been carefully apportioned; one makes the laws, another construes and adjudges as to the rights of persons to life, liberty and property thereunder, and the third executes the laws enacted and the judgments decreed. While each department, in its sphere, is in a sense independent, each operates as a check or restraint upon the other. The acts of the legislature have to be presented to the executive for his approval. The courts may then construe the acts and determine their validity under the Constitution; and the executive may, in criminal cases, modify the action of the courts by the interposition of his pardoning power. But in every case in which one department controls,

modifies or influences the action of another, it acts strictly within its own sphere, thus giving no occasion for conflict and thus preserving the purpose of the original scheme of a division of power among the three co-ordinate branches of government, each operating as a restraint upon the other, but still in harmony.

As we have seen, the power of the king has been divided — a portion delegated to Parliament and another portion to the judiciary — but except as delegated to the legislative and judicial branches of the government, his common-law powers remain unchanged, and in our government have been transmitted to the executive.

Under the common law a writ of mandamus issued in the king's name to inferior courts, officers, corporations or persons, requiring them to do a particular thing specified. It being issued in the king's name, did not run to himself, to Parliament, nor to the judiciary, except such inferior courts as the higher courts had the power to review. Under our Code the writ issues out of the court as an order of the court; but we have attempted by no provision of the statute to change the force and effect of the common-law writ, nor its object and purpose. It, therefore, follows that the writ never issues to the executive or legislative branches of the government, nor to the judicial branch having general and final jurisdiction.

Again, it is the well-settled practice of the court not to determine abstract questions not involved in the litigation, or in regard to which it has no power to enforce its judgments and decrees.

The only way in which a mandamus can be enforced is by the commitment of the party who refuses to obey its commands as for a contempt. But the courts have no power to commit the governor for a contempt. They have no power over his person. He may be impeached, but there is no other way in which he may be deprived of his executive office. It is said, however, that it is not to be supposed that the governor will refuse obedience to the law; but the application in this

case for the mandamus shows that he already has refused to do the act sought to be compelled by this writ.

But again, it is contended that in this case the executive is one of a board of officers, and that the board may be compelled to act by mandamus. Conceding him to be one of a board of public officers, the duty is one that devolves upon him by virtue of his office. If the courts have not power over his person to enforce its decrees in the one case, they have not in the other.

We have already referred to the discussion of Judge Cooley in the *Sutherland* case, with reference to the grade of duties imposed upon the executive, including ministerial acts, together with those involving executive judgment and discretion; and without repeating his argument here, it appears to us that his reasoning is unanswerable and his conclusions correct.

While we are of the opinion that a mandamus will not issue to the governor to compel performance of an act by him, we see no reason for its not running, during the recess of the legislature, to the lieutenant-governor and speaker of the assembly. During the session of the legislature, they, as members thereof, are not subject to arrest; and it may be that the courts, during that time, would not have the power to enforce their mandates against them; but, after the adjournment of the legislature, and the time has elapsed given by the statute in which they are exempted from arrest, we think their obedience to the writ may be compelled by the courts. True, under the provisions of the Constitution, they in turn may succeed to executive power, upon the happening of certain events; but until they respectively become vested with the powers of the governor, they form no part of the co-ordinate branches of the government, except, as we have already stated, when the legislature is in session.

There is another reason which must control our action in this case. As we have seen, the alternative writ of mandamus was issued during the administration of Governor Morton, when Saxton was lieutenant-governor and Fish was speaker. The Special Term denied the writ, but, upon appeal, the Appellate Division reversed the order of the Special Term

and ordered the writ to issue to the governor, lieutenant-governor and speaker then in office, who were the successors of those in office at the time the alternative writ was issued. This was done without notice to the new officials, and without bringing them in or making them parties to the proceeding. The act charged against the former officials was a misdemeanor, and punishable as such, and they were liable individually in damages to the party aggrieved. The delinquency charged is personal, and does not involve a charge against the state. It is not a claim prosecuted against the state in which it alone is interested, as where a mandamus is issued to a treasurer or comptroller of the state, to compel the payment of a claim against it, which is litigated by the officer for and in behalf of the state, in which the courts have permitted the mandamus to issue to the successor in office. In cases in which the delinquency charge is personal, the petition for a writ of mandamus abates upon the death, resignation or termination of office of the official charged, unless it is preserved by statute. ( *Warner Valley Stock Co.* v. *Smith*, 165 U. S. 28, 31, and cases there cited.)

Under the provisions of our Code of Civil Procedure, section 755, a special proceeding does not abate by any event, if the right to the relief sought in such proceeding survives or continues; but this provision only applies to cases where the party dies after this act takes effect. There has been no death of a party in this case. Certain of the parties proceeded against have gone out of office, and it may, therefore, be doubted whether this section keeps the proceeding alive. But, assuming for the purpose of this case that it does and that the relator still has the right to prosecute his proceeding for his restoration, against whom must such proceeding continue? It cannot be continued against the old officers, for they no longer have power to restore him. It must, of necessity, therefore, be prosecuted against the new officers, for they alone have the power to reinstate him. It may be that the provisions of the Code fail to point out the precise practice that should be adopted by the relator in this case.

But there is no apparent reason why the provisions of the Code controlling actions and special proceedings against county, town and municipal officers, should not apply as well to state officers. The practice therein provided for is simple and affords ample protection to all parties. Section 1930 provides : " In such an action or special proceeding, the court must, in a proper case, substitute a successor in office, in place of a person made a party in his official capacity, who has died or ceased to hold office ; but such a successor shall not be substituted as a defendant, without his consent, unless at least fourteen days' notice of the application for the substitution, has been personally served upon him." As we have seen, no substitution has been made in this case.

The order of the Appellate Division should be reversed, and that of the Special Term affirmed.

VANN, J. I am of the opinion that a writ of mandamus cannot be issued against either the governor or lieutenant-governor, because the imprisonment of either, which might follow a failure to obey the writ, would disturb the constitutional balance of power between the three great departments of government. As to the governor this is obvious, but the same reason applies to the lieutenant-governor also, because at any moment by the death, resignation, inability or absence of the governor the powers and duties of the office devolve upon the lieutenant-governor. Whatever would interfere with his freedom of action when it became his duty to act as governor would interfere with the executive office itself, and might leave the state with no executive head able to act at a time of the greatest need. But while the Constitution, as well as the courtesy due from one department of government to another, forbid the courts to command the governor to do this, or to refrain from doing that, it is still their duty to announce the law, but, under the circumstances, to withhold the command and leave the responsibility of complying with the law, as laid down by the courts, with the chief magistrate. It seems to me, therefore, that we should decide the appeal upon its

merits, subject to the limitation suggested as to the form of the judgment to be pronounced.

Upon examining the record I think the relator was removed in violation of chapter 716 of the Laws of 1894 for the reasons given by the Appellate Division in its opinion. (24 App. Div. 563.)

The judgment appealed from should, therefore, be so modified as to simply adjudge that the relator was improperly removed and that he is entitled to immediate reinstatement, without costs to either party as against the other.

O'BRIEN, J. (dissenting).    The decision in this case, as expressed in the prevailing opinion, practically abrogates the statute which exempts veteran soldiers in the civil service from removal without legal cause.    The defendants are the trustees of the State Capitol under § 2 of chapter 227 of the Laws of 1893, and the superintendent of public buildings appointed by them, who has power, subject to the control of the trustees, to appoint, remove or suspend persons in the employ of the state who are or may be engaged on the Capitol force, or in the care of any of the public buildings.    By chapter 716 of the Laws of 1894, honorably discharged Union soldiers must be preferred by the trustees and superintendent in making such appointments, and it is provided that removals of such discharged soldiers, after appointment, shall be made only for incompetency.    In case a veteran is removed without such cause, or for partisan or political reasons, or refused a preference in making appointments, the statute gives a right of action to him for damages as for a wrongful act, in addition to the existing right of mandamus to enforce the commands of the statute.

In January, 1887, the relator, who is a veteran of the late war, was appointed an orderly upon the Capitol.    He was not appointed for a definite or limited time, and, therefore, under the statute, could not be removed except for incompetency. He was removed, however, in the month of October, 1895, in defiance of the statute, without legal cause or hearing.    He

applied to the court for a mandamus to correct the wrong and to assert the rights secured to him by law. In his application for the writ the relator alleged upon oath the following facts : (1) That he was an honorably discharged Union soldier. (2) That he was appointed an orderly on the Capitol on January 3d, 1887, and continued in that position till October 2d, 1895, when he was discharged, as he alleges, for partisan, political or other reasons than those allowed by the statute. (3) That the defendants have kept the relator out of his position ever since, and have refused to reinstate him. (4) That during all the time while so employed, he faithfully discharged his duties and was not incompetent, and did nothing inconsistent with his position. (5) That he was never notified of any cause for his removal or called on to answer any charge, and none was made. The only affidavit made in opposition to this application was by the superintendent, and he failed to deny any fact which the relator had stated. The other defendants did not answer at all. Consequently, there was no issue of fact before the court but what was equivalent to a demurrer to the facts alleged by the relator. (*People ex rel.* v. *Supervisors, etc.,* 103 N. Y. 541 ; *People ex rel.* v. *Cromwell,* 102 N. Y. 477 ; *In re Haebler,* 149 N. Y. 414 ; *People ex rel.* v. *Mayor, etc.,* Id. 215.) He was, therefore, entitled to a peremptory writ, but as he had claimed not only to be reinstated, but damages for his removal as well, an alternative writ was awarded.

The cause was then referred and tried by a referee. The issues were matters of law really, though it was supposed that there was some question of fact, but just what question was not very clear. The referee found the following facts : (1) That the relator was a veteran. (2) That he was employed running an elevator at the Capitol from February 1, 1887, to October 2d, 1895. (3) That he was then dropped from the payroll. Therefore, every material fact in the case was not only admitted by the pleadings but found by the referee.

But the learned referee held, as a conclusion of law, that although he had been dropped from the payroll, he had not been removed, and he dismissed the writ, with costs. The

Appellate Division has reversed this judgment and directed that the relator be reinstated in his position, without prejudice to his right to recover damages. This seems to me to be a very just and correct decision, and it ought not to be set aside by this court on any trivial ground.

My brethren, however, think the Appellate Division was wrong and the referee was right. The reasoning process by which this conclusion is reached does not impress me as sound in law or correct in morals; and, since it practically abrogates the statute by denying to the relator any right which it confers, I am constrained to dissent from the judgment and from every ground upon which it is placed. In my view the reasons stated for a reversal in this court of the decision of the court below are utterly untenable, and hence a brief discussion or review of them may not be out of place here.

1. The first proposition, though really foreign to the case, is somewhat startling. The principle that a mandamus will not lie against the governor as a member of the board of trustees of public buildings created by the statute is announced as law in this state, I think, for the first time. It is broadly asserted that the courts have no power to compel the governor, when acting as a member of this board, in appointing or discharging the necessary help in and about the Capitol to obey the statute. It is admitted that every member of the board is bound to obey it; but if the governor neglects or refuses to do his duty, or if he should disregard the statute, the courts, it is said, are powerless to protect the relator's rights by mandamus. This proposition is based upon the notion that there is something about the office of governor that places the occupant of the office for the time being above and beyond the law or at least beyond the power of the courts to compel him by mandamus to obey the plain mandate of the statute in the appointment and removal of veteran soldiers. I take it to be an indisputable legal proposition that when the governor of this state accepts a legislative appointment as a member of a board of trustees, with duties prescribed by statute, as the duties of this board clearly are, he is amenable to legal pro-

cess at the suit of a private citizen whose rights are affected by the action of the board in the same way and to the same extent as any other member of the board. The principle has been so often asserted by the courts of the highest authority that it must disturb our confidence in the stability of law to find any doubt expressed about it.

In the famous case of *Marbury* v. *Madison* (1 Cranch, 170) Chief Justice Marshall stated the principle in a single sentence when he said : " It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus is to be determined." In *Kendall* v. *United States* (12 Peters, 595) the attorney-general of the United States, representing the government, stated the rule of law on this subject in the following language : " And, as the ordinary character of an officer's functions would not always determine the true nature of a particular duty imposed by law, he further agreed that if an executive officer, the head of a department, or even the president himself, were required by law to perform an act merely ministerial, and necessary to the completion and enjoyment of the rights of individuals, he should be regarded, *quoad hoc*, not as an executive, but as a merely ministerial officer, and, therefore, liable to be directed and compelled to the performance of the act by mandamus if Congress saw fit to give the jurisdiction." The court, in its opinion in this case, said : " But it would be an alarming doctrine that Congress cannot impose upon any executive officer any duty they may think proper which is not repugnant to any rights secured and protected by the constitution ; and in such cases the duty and responsibility grow out of and are subject to the control of the law and not to the direction of the president. And this is emphatically the case where the duty enjoined is of a mere ministerial character." In *Board of Liquidation, etc.*, v. *McComb* (92 U. S. 531) the court awarded a mandamus against a board of which the governor of the state was a member, and, referring to the power to do that, stated the rule as follows : " But it has been well settled that when a plain

official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance." (p. 541.) This rule has been strictly adhered to by that court in a great variety of cases where the writ was applied for against executive officers of the government. (*U. S.* v. *Black,* 128 U. S. 40; *U. S. ex rel. Boynton* v. *Blaine,* 139 U. S. 306.) The power of the courts to compel ministerial officers to perform official acts upon which the rights of individuals may depend is well settled in England. In the case of *Ferguson* v. *Earl of Kinnoull,* decided in the House of Lords, the distinction between a judicial and ministerial act was clearly recognized. In that case Lord Brougham, after denying that the judicial officers of courts of general jurisdiction were answerable for acts done within the limits of their jurisdiction for errors of judgment, used the following language : " But where the law neither confers judicial power, nor any discretion at all, but requires certain things to be done, every body, whatever be its name, and whatever other functions of a judicial or of a discretionary nature it may have, is bound to obey, and, with the exception of the legislative branches, every body is liable for the consequences of disobedience." (9 C. & F. 251.) In *State ex rel. Whiteman* v. *Governor* (5 Ohio St. 535) there was an application for a mandamus against the governor, in which eminent counsel were engaged. The power of the courts in that regard was there elaborately discussed and decided. It was held that the writ would lie against him at the suit of a private individual interested in the performance of the official act. The court was unanimous, and the result was summed up in the following language, which I conceive to be applicable to the case at bar : " The constitutional provision declaring that ' the supreme executive power of this state shall be vested in the governor,' clothes the governor with important political powers, in the exercise of which he uses his own judgment or discretion, and in

regard to which his determinations are conclusive.   But there is nothing in the nature of the chief executive office of this state which prevents the performance of some duties *merely ministerial* being enjoined on the governor.   While the authority of the governor is supreme in the exercise of his political and executive functions which depend on the exercise of his own judgment or discretion, the authority of the judiciary of the state is supreme in the determination of all legal questions involved in any matter judicially brought before it.   Although the state cannot be sued, there is nothing in the nature of the office of governor which prevents the prosecution of a suit against the person engaged in discharging its duties.   *   *   *   However, therefore, the governor, in the exercise of the supreme executive power of the state, may, from the inherent nature of the authority in regard to many of his duties, have a discretion which places him beyond the control of the judicial power, yet, in regard to a mere ministerial duty enjoined on him by statute, which might have been devolved upon another officer of the state, and affecting any specific private right, he may be made amenable to the compulsory process of this court by mandamus.   The official act of the governor in question, in regard to issuing the proclamation asked for, is a duty prescribed by statute, not necessarily connected with the supreme executive power of the state, ministerial in its nature, and a duty which might have been enjoined on some other officer."

It would be quite sufficient to rest the question, I think, on our own decisions.   In *People ex rel. Fonda* v. *Morton* (148 N. Y. 156) we reviewed the action of this very board of trustees, and no one then doubted our power.   It is said that the point was not raised in that case ; but the very fact that neither court nor counsel supposed that it contained such a question, or that there was anything in this point, goes far now to prove that it is but little more than an attractive novelty.   It may, I think, be safely asserted that no respectable authority can be found to sustain the proposition that the courts are without power to enforce by mandamus the performance by the

governor of an official act, ministerial in character, and not resting in discretion.

That the powers and duties of the governor as a member of the board of trustees of public buildings are purely ministerial is a proposition too plain for doubt. The four individuals composing the board had each one vote, and no member had any more power than the other. They were all doing precisely the same thing, that is to say, consulting, voting and deliberating together. It is inconceivable that any one can suppose that three of these were acting ministerially, while the acts of the other were executive. But here again it may be necessary to cite authorities.

In *Gray, Governor,* v. *The State* (72 Indiana, 568) it was held that a writ of mandamus will lie against the governor of the state to enforce the performance of a ministerial duty not resting in his discretion ; that a ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act being done.

Concerning the nature of the governor's act while serving upon such a board, the court defined it in the following very clear and concise language : " Any power or authority vested by legislation in the governor, together with other officers or persons, in which they are to have an equal voice with him, cannot be executive, as he alone is vested with the executive power of the state. Any duty which he is by law required to perform, in connection with others, in which they have an equal voice with him, can in no sense be said to be an executive duty. The governor and the other officers named in the act may well be regarded as constituting a board, organized by the legislature for the performance of certain duties, and a mandamus will lie against them to enforce the performance." (Id. p. 578.)

I have said that there was no authority worthy of the name in favor of the contention that the executive of a state is beyond the power of the courts to compel the performance of an official

act of a ministerial nature. I do not of course refer to cases which may be found where the writ was refused in the *exercise of discretion.* The case of *Low* v. *Towns, Governor* (8 Georgia, 370), is a leading case of that character The court in an able opinion demonstrated its power to grant the writ against the governor, but refused to exercise the power for political reasons and as matter of discretion. The cases cited in the prevailing opinion to sustain the reversal are all cases of that character.

This court cannot deal with matters of discretion. The court below has exhausted the discretion which courts have in mandamus cases. It has exercised the discretion and granted the writ, and the only question that we can review is whether it had power in that respect. That it had, is to my mind a proposition so clear that I will forbear to discuss it further. I have called attention to a few leading cases, not desiring to enlarge the discussion by reference to numerous others of the highest authority, all holding the same way.

I am not willing to indorse the principle that the maxim which tells us that the king is the fountain of justice and mercy and can do no wrong, has any application to the elected servants of the people of this state. It originated when kings were supposed to rule by divine right, but any one who believes for a moment that it implied the immunity of persons in high seats of power from obedience to the laws, has failed to read correctly the history of the people from whom the maxim has been borrowed. On the contrary, the courts of that country have for ages announced and enforced the principle that no one was so high as to be above the power of the law, or so low as to be beneath its protection. This principle has been transmitted to us, and in the administration of justice it has superseded the ancient maxim that the king can do no wrong.

Nor can I admit for a moment that the judicial power of this state is so feeble as to be unable to reach with its process, in the enforcement of its lawful judgments and decrees, every citizen within its territory, from the governor to the humblest

workman, and one as well as the other. The notion that the rights of a citizen cannot be declared and enforced against a ministerial board of which the executive happens to be a member, because he may call out the military and naval forces of the state to resist the judgment of the court, is too trivial for serious consideration. It is the duty of the court to declare what the law is without fear or favor, and let consequences take care of themselves. Courts cannot with any self-respect frame their judgments upon the view that some power may refuse to submit to the mandate of the law, or may resist it. The sheriff has the power of the county behind him, and the mayor of a great city the police force, but no one ever supposed that their power to resist a mandamus was any reason for refusing it to a party otherwise entitled to it. A legal principle resting on the assumption that the executive will refuse to obey the courts, must necessarily be unsound. It implies a want of that freedom of action on the part of the judiciary which is always necessary for its efficiency. If the courts may be deterred from deciding what the law is in such cases, upon some remote possibility that the executive power will resist the execution of the judgment, it would follow that a mandamus should never go against any one possessing the physical or political power to resist its commands, but should be confined to those who are too weak to defy it. Such vague or imaginary fears have no proper place in the discussion of questions upon which legal rights depend. I doubt very much that this state ever had an executive that would agree with my brethren with respect to this immunity from judicial authority, and it is to be hoped that it never will have. The proposition that there is or may be one man in the state so far above his fellow citizens that the courts cannot reach him, in a case like this, where there is no discretion, sounds very much like a voice from the middle ages, or the decree of the Roman Senate in its declining days when it declared the Emperor above the laws.

It is only a short time since the courts fined all the members of a board composed of all the state officers for disobey-

ing a mandamus, and this court affirmed their action. (*People ex rel. Platt* v. *Rice*, 144 N. Y. 249). If it so happened that the governor had been a member of that board, then, according to the prevailing opinion, the courts would be powerless, since all the other members could shelter themselves behind the executive prerogatives. The court below was not able to sanction such sophistry, and I am bound to say that the rugged good sense of their decision ought to receive at least some commendation from this court.

(2) But even if the governor was beyond the power of the courts, there are still three other members of the board, constituting a working majority, that no one claims to be exempt from control by mandamus. They have the power, and it is their duty to execute and obey the statute with respect to veterans, and to give to the relator his rights under the law. What reason can this court give for reversing the judgment as to them? Absolutely none that, in my opinion, has the slightest force or weight in law, and this can be made quite clear by a brief review of the grounds upon which the decision of the court below is to be reversed. That ground, as will be seen, consists of questions of practice, and questions of discretion, with none of which this court has anything to do, combined in such a way as to produce what is supposed to be a legal error. It is only necessary to separate the constituent elements upon which the decision rests in such a way that each proposition may be reviewed by itself, and on its own merits. It will then be seen how feeble the argument is upon which the relator is defeated in the assertion of his just rights under the law.

It is suggested that as three members of the present board were not parties to the original proceeding, but came into office afterwards, the writ was improperly awarded against them. There are several conclusive answers to this point. (1) A party who has proceeded by mandamus against a continuing board or public body for the assertion of a right is not compelled to revive it whenever the personnel of the board is changed by resignation or expiration of the official term

of the members, or any of them.   The relief is to be awarded against the board as an official body, and the fact that the individuals composing it are also named is of no consequence. The proceedings do not abate upon every change of membership, but when, as in this case, there is a continuing duty, irrespective of the incumbent, the writ is properly directed to the board as then constituted and who have the power to redress the wrong.   Any other rule would be, as the courts have often said, sacrificing substance to form, so that the final process of the court was properly directed to the members of the board in office when the decision was made.   (*People ex rel.* v. *Collins*, 19 Wend. 56; *People ex rel.* v. *Champion*, 16 Johns. 60; *People ex rel.* v. *Gilon*, 121 N. Y. 551; *Thompson* v. *United States*, 103 U. S. 480, 483; *State ex rel.* v. *Madison*, 15 Wis. 30, 37; *State ex rel.* v. *Gates*, 22 Wis. 210, 214; High on Ex. Rem. § 38.)   (2) If the relator in entering the judgment directed the process against the wrong persons, or against persons not parties to the action, that is no ground of appeal to this court.   It was simply a misuse of the writ, to be corrected by motion in the court from which the process issued.   This court might as well entertain an appeal from a judgment on the ground that the execution was issued against the wrong party. It can deal only with questions of law.   The writ should certainly go against either Governor Morton and his associates or Governor Black and his fellow-members of the board. That is a question of practice with which this court has nothing to do.   Certainly not upon an appeal from this judgment. (3) The case comes here now with the present members of the board named as defendants.   It does not concern this court how they came into the case.   Presumptively they came in the proper way.   They came into the case after the issues were tried and decided.   For aught we can know they were substituted in open court on the consent of counsel.   If their names were improperly used in the writ they could have moved to correct the papers.   No one ever claimed that, or claims it now.   Just how an error of law, reviewable in this court upon appeal from the judgment, can be evolved from

the fact that the relator or his attorney inserted in the writ the names of the present members of the board who are in office, in place of the former members who are not in office, is quite difficult to perceive.   The present members have appealed from the judgment, and if they have never in fact or in law been made parties to the record they have no right to appeal. (4) When the reasons for reversing this judgment are fairly analyzed it will be seen that they may be summed up in two propositions :   (1) The governor being a member of the board and exempt from direction by mandamus the other three members are exempt also.   The immunity of the governor from the duty of obedience to the law is imparted, in some incomprehensible way, to his associates, and the result is that the law is powerless to grant the relator any relief, although he has clearly shown that his rights have been disregarded. Of course, if this proposition be sound, the judicial power to compel boards or ministerial bodies to obey the law may be always paralyzed as to all such bodies in the state by making the governor a member *ex officio*, or otherwise.   This is rather an alarming principle, and I am quite sure that it has no sanction in reason or law, and · equally clear that no respectable authority can be found to sustain it. (2) The other point is that the present members of the board have not been substituted on notice.   I have already answered that, but it may not be amiss to refer to it again.   How do we know that they were not regularly and properly substituted ?   We find their names in the writ, and that is all we know, or can know, about it.   An order substituting parties in an action, with or without notice, is not reviewable in this court, since it is a mere practice order, and if not, then by what process of reasoning can some real or imaginary irregularity in that respect be made a ground for reversing a judgment ?   If anything in that respect was done in the court below irregularly, the obvious remedy is to move to correct it in that court.   It has nothing whatever to do with the legal merits of the questions decided by that court and which, alone, we have the power to review.   All the court below decided

was that the relator, being a veteran, was removed in defiance of the statute, and was entitled to be restored to his place. It is to be regretted that this court should feel bound to reverse a judgment so obviously correct upon mere points of practice or procedure, having no proper relation to the real controversy, and with which this court, in my opinion, has nothing whatever to do.

I am, therefore, in favor of affirming the judgment below.

GRAY, BARTLETT and MARTIN, JJ., concur with HAIGHT, J., for reversal.

PARKER, Ch. J., agrees with HAIGHT, J., that mandamus should not issue against the governor, but concurs with O'BRIEN, J., that it was properly issued against the other defendants, and advises that the order be modified accordingly, and as so modified affirmed.

VANN, J., reads memorandum for modification of judgment.

O'BRIEN, J., reads for affirmance.

Order reversed, etc.